Filed 10/17/24  In re C.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.B. et al, Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083755 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J287910, J287911) |
| v. | OPINION |
| C.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Conditionally reversed with directions.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

1

C.B (father) appeals from the juvenile court's order terminating parental rights (Welf. & Inst. Code,[1] § 366.26) as to his children, C.B., Jr. and Josie B. (the children). Father contends the matter must be conditionally reversed and remanded because the court failed to ask two paternal relatives about the children's possible Native American ancestry. We conditionally reverse the order terminating parental rights and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Father and Jamie N. had two children together — C.B, Jr. and Chloe N.. Father later married another woman named Tamara B., and they had one child together — Josie B.[3]

On January 26, 2021, the San Bernardino County Children and Family Services (CFS) filed petitions on behalf of C.B., Jr., who was nine years old at the time, and Josie B., who was six years old. Both petitions alleged that the children came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

[2] The first portion of the procedural background is taken from the opinion in father's prior petition for extraordinary writ, in which he challenged the juvenile court's order bypassing his reunification services. (*C.B. v. Superior Court* (June 6, 2022, E078770 [nonpub. opn.] (*C.B.*)) We incorporate the record in E078770 in this case.

[3] Neither Jamie N. nor Tamara B. are parties to this appeal.

protect), (f) (parent caused death of another child through abuse or neglect), (g) (no provision for support), (i) (cruelty), and (j) (abuse of sibling).

The social worker filed a detention report and stated that CFS received an immediate response referral alleging physical abuse of the children by Tamara B. It was reported that Chloe N. (C.B. Jr.'s sister) got dizzy, fell, and hit her head. She became lethargic and Tamara B. attempted to feed her oatmeal, but she did not respond. Tamara B. gave Chloe N. Narcan and called the police. When they arrived, Chloe N. was unconscious. She was taken to the hospital where she was pronounced dead. (*C.B.*, *supra*, E078770.) A social worker obtained a detention warrant for the children the following day, and the children were detained.

The court held a detention hearing on January 27, 2021. The court asked Tamara B. if she had Native American ancestry, and she said she was registered with the "Yupik [*sic*], Eskimo tribe."[4] Father denied having any Native American ancestry. The court asked father where Jamie N. (C.B., Jr.'s mother) was living, and father said he had no idea.[5] The court detained the children and set a jurisdiction/disposition hearing for February 23, 2021.

CFS initiated a search for Jamie N. and efforts revealed eight addresses and 11 phone numbers. CFS sent Jamie N. notice of the jurisdiction/disposition hearing at the numerous addresses and confirmed one of the phone numbers as her contact number.

---

[4] The Jupik Tribe is apparently part of the Mekoryuk Tribe.
[5] The court then asked Tamara B. about her other son, Julian H., whose father was M.H. Julian H. is not a subject of this appeal.

3

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report, requesting a 45-day continuance. The social worker reported that father denied having any known Native American ancestry again on February 2, 2021. However, on February 8, 2021, he said he may have an insignificant amount of Indian heritage, but did not name a tribe. Father also stated he was primarily raised by his mother, who had passed away. On February 10, 2021, the social worker asked the paternal grandfather if there was any Native American ancestry on his side or the paternal grandmother's side, and he said no.

The social worker further reported that Jamie N. was given notice of the jurisdiction/hearing via phone call on February 5, 2021. The social worker received a return phone call from Jamie N., and the social worker informed her that Chloe N. passed away and C.B., Jr. was in CFS's care. On February 12, 2021, the social worker conducted a phone interview with Jamie N. and asked if she had any Native American ancestry. Jamie N. claimed Indian heritage in the Chumash tribe through her father's side of the family. Notices were sent out with regard to C.B., Jr., indicating that a child custody proceeding under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et. seq.) (ICWA) had been initiated, and a jurisdiction/disposition hearing was scheduled for February 23, 2021. The notices indicated that C.B., Jr. may be eligible for membership in the Chumash tribe and listed information for Jamie N. and father. Notice was sent to the Bureau of Indian Affairs (BIA), Santa Ynez Band of Mission (Chumash) Indians, and the Tejon Indian Tribe. On or around February 11, 2021, the Santa Ynez Band of Chumash Indians responded and said C.B., Jr. was not an enrolled member and not

4

eligible for enrollment. The Tejon Indian Tribe also responded, stating C.B., Jr. and his parents were not members of the tribe.

As to Tamara B. (Josie B.'s mother), the social worker reported that, on January 28, 2021, she said she had Native American ancestry through the maternal side of her family, and her mother and grandmother were enrolled members of a tribe called the Native Village of Mekoryuk (the Mekoryuk Tribe). On February 8, 2021, CFS sent ICWA notice to the BIA and the Mekoryuk Tribe. The Mekoryuk Tribe responded and said Tamara B. was an enrolled member, and her children were not members, but were eligible for enrollment. The Mekoryuk Tribe intervened and began to attend the dependency hearings.

On April 8, 2021, the social worker filed an addendum to the jurisdiction/disposition report and requested another 45-day continuance. The jurisdiction/disposition hearing was continued multiple times.

On May 7, 2021, the court found that proper and adequate ICWA inquiry had been conducted by CFS as to Josie B., ICWA notice was sent out, and there had been an affirmative response of tribal eligibility of membership. The court ordered that ICWA applied and no further notice was required.

The court held a contested jurisdiction/disposition hearing on March 23, 2022, sustained the petitions, and declared C.B., Jr. and Josie B. dependents. It bypassed reunification services for father and Jamie N. The court found that ICWA applied in Josie B.'s case and the Mekoryuk Tribe was her tribe, but that ICWA did not apply to C.B., Jr.. The court set a section 366.26 hearing for July 21, 2022.

5

Father filed a Notice of Intent to File a Writ Petition on March 30, 2022. This court affirmed the denial of his reunification services. (*C.B.*, *supra*, E078770.)

*Section 366.26 and Permanent Plan Review* (*PPR*)

On July 20, 2022, the social worker filed a section 366.26 report recommending the "permanent plan of foster care with the permanent plan of adoption."[6] The report indicated ICWA did not apply to C.B, Jr. and that on March 23, 2022, the court found he did not come under the provisions of ICWA. As to Josie B., the report indicated that ICWA did apply.

The court held a section 366.26 hearing on July 21, 2022. The court continued the children as dependents of the court, finding that termination of parental rights would be detrimental, as they were living with foster parents who were unwilling or unable to adopt them, but were willing to provide them with a stable environment. The court ordered the permanent plan of placement in foster care with a permanent plan of adoption and continued the matter for a PPR on January 20, 2023.

The social worker filed a status review report on January 17, 2023 and noted that the court ordered an Interstate Compact on the Placement of Children with the state of Alaska for placement of the children with Josie B.'s maternal grandparents. However, CFS had concerns regarding the protective capacity of the maternal grandparents. The social worker noted that the children wanted to be placed with the paternal grandfather

---

[6] The social worker actually filed separate section 366.26 reports with regard to C.B., Jr. and Josie B. However, for the sake of simplicity, we will just refer to the social worker's section 366.26 report, understanding that it incorporates both reports.

and his wife, with a plan of adoption.  As to C.B., Jr., the social worker opined that a section 366.26 hearing was not in C.B., Jr.'s interest since he was not a proper subject for adoption at that time and a potential legal guardian had not been identified.

The court held a PPR hearing on January 20, 2023 and ordered no visitation between the children and their parents.  It continued the matter to April 14, 2023 for a further PPR hearing.

The court held a PPR hearing on April 14, 2023 and allowed the paternal grandfather and his wife overnight visits with the children three times a week.  The court continued the matter to June 9, 2023.

On June 9, 2023, the court held a hearing on the issue of placement.  The court heard testimony from several witnesses, including father's brother, Chris O. (the paternal uncle), and father's aunt, Sharon L. (the paternal great aunt), who were there to testify about the paternal grandfather's propensity for violence.  The paternal great aunt was the paternal grandmother's sister.  After hearing testimony, the court ordered an extended visit with the paternal grandfather and his wife, and ordered the parties back on July 21, 2023.

On July 21, 2023, the court ordered the children placed with the paternal grandfather and his wife, and set a section 366.26 hearing to determine the most appropriate permanent plan.

The court held a hearing on January 25, 2024, and Jamie N. made her first appearance in court.  The court asked her if she had any Native American ancestry, and she said had Chumash ancestry and was in the process of enrolling with the tribe.  Jamie

7

N. completed an ICWA Inquiry form (CFS 030) and an ICWA-020 form indicating that her father was a member of the "Chumash Santa Ynez Band." The court ordered the matter continued to April 4, 2024.

The social worker filed a report on April 2, 2024, recommending that the court terminate parental rights and set adoption as the permanent plan. She reported that, on March 4, 2024, CFS sent informal ICWA notice via email to the BIA and the "Santa Ynez Band of Cumash [*sic*] Mission Indians of the Santa Ynez Reservation." Furthermore, the social worker contacted Jamie N.'s father, who said he was a registered member of the "Santa Ynez C[h]umash tribe." However, on March 27, 2024, the social worker received notice from the Santa Ynez Chumash tribe stating, "This family is not from the Santa Ynez Band of Chumash Indians."

The court held a section 366.26 hearing on April 4, 2024. County counsel informed the court that CFS attempted to contact the BIA and Chumash tribe regarding C.B., Jr., and there was no reason to believe or know he was a member or eligible for membership. County counsel requested the court to find that ICWA did not apply to C.B., Jr. The court asked if anyone objected to that finding, and no one objected. Thus, the court found that ICWA did not apply to C.B., Jr. As to Josie B., all parties stipulated to a qualified ICWA witness expert's report, which stated that Josie B. was a member of the Mekoryuk tribe, and that removal from father and Tamara B. was necessary to protect her. The ICWA expert further reported that Josie B. "is placed in a Mekoryuk Native Village tribal ICWA preferred and compliant out of home placement" with C.B., Jr., and that the current caregivers indicated they were willing to support Josie B.'s connection to

8

the Mekoryuk Tribe. County counsel argued that the court should terminate parental rights and free the children for adoption. Father testified about the bond he had with the children and objected to the termination of parental rights, arguing that the beneficial parental exception applied. Tamara B. (Josie B.'s mother) objected to the termination of parental rights and the plan of adoption. Jamie N. (C.B., Jr.'s mother) submitted on CFS's recommendation of termination of parental rights and adoption. Counsel for the children also submitted on CFS's recommendation.

The court found the children generally and specifically adoptable. It then found that the benefits of adoption outweighed the parent-child relationship, and it terminated parental rights.

### DISCUSSION

### The Matter Should Be Remanded for Further Inquiry

Father's sole argument on appeal is the juvenile court failed to ensure compliance with California law enacted to implement ICWA. Specifically, he cites California Rules of Court, rule 5.481, subdivision (a)(2)(A) (hereinafter, rule 5.481), and contends that during the placement hearing on June 9, 2023, the paternal uncle (Christopher O.) and the paternal great aunt (Sharon L.) testified, yet were not asked about possible Indian ancestry. Father avers that, under rule 5.481, the court owed a duty to ask "each participant" whether they knew or had reason to know the children were Indian children. He concludes that since CFS and/or the court failed to inquire of the paternal uncle and paternal great aunt, the court's implied finding of an adequate inquiry constituted an abuse of discretion. We conclude the matter should be remanded for further inquiry.

9

A. *Applicable Law*

"ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. [Citation.] California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes." (*In re Ricky R*. (2022) 82 Cal.App.5th 671, 678, disapproved on other grounds, as stated in *In re Dezi C*. (2024) 16 Cal.5th 1112, 1152, fn. 18 (*Dezi C*.).) CFS and the juvenile court have an "affirmative and continuing duty to inquire" whether a child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a).) "The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 430.) Section 224.2 "creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. [Citation.] Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' [Citation.] Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).)

The duty of initial inquiry begins with the initial contact, when CFS must ask "the party reporting child abuse or neglect whether the party has any information that the child

10

may be an Indian child." (§ 224.2, subd. (a).) Once a child is taken into temporary custody, CFS must ask the child, the parents, legal guardian, extended family members, and others who have an interest in the child whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, and sisters. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"At the commencement of a child custody proceeding, the court is obligated to inquire from each participant whether there is a 'reason to know' that the child is or may be an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1129-1130; 25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(a) (2024); § 224.2, subd. (c)[7].)

The juvenile court "has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.) If the court finds that CFS has complied with its duty of inquiry and there is no reason to know that the child is an Indian child, then the court may find that ICWA does not apply. (§ 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3)(A).) "A juvenile court's finding that ICWA does not apply implies 'that social workers had fulfilled their duty of inquiry.' " (*In re*

---

[7] We note that, effective September 27, 2024, section 224.2, subdivision (c) was amended and provides that at the first hearing on a petition, "the court shall ask each party to the proceeding and all other interested persons present whether the child is, or may be, an Indian child, whether they know or have reason to know that the child is an Indian child."

*Dominick D.* (2022) 82 Cal.App.5th 560, 567.)  "[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order."  (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)  However, "'the juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is "a quintessentially discretionary function" [Citation] subject to a deferential standard of review.'"  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141; see, *In re K.H.* (2022) 84 Cal.App.5th 566, 589 ["the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case"].)

B.  *The Court's ICWA Finding Is Not Supported by Substantial Evidence*

It is undisputed that the paternal uncle and the paternal great aunt were not asked about the children's potential Indian ancestry at the placement hearing.  However, CFS contends it complied with its duty of inquiry, and any error was harmless, since there was extensive ICWA noticing to the relevant tribes, and there was tribal participation in the proceedings.  Further, it was speculative to think that inquiring of the paternal uncle and paternal great aunt would reveal any relevant information.

We first note this case is unique in that it involves father's two children, C.B., Jr. and Josie B., who have different mothers.  Although there are three parents involved, father's claim only concerns *his* side of the family.  The record demonstrates that, at the detention hearing on January 27, 2021, the court asked father if he had any Native American ancestry, and he said no.  He again denied having any known Native American ancestry on February 2, 2021.  However, a few days later, father said he *may* have an

insignificant amount of Indian heritage, but did not name a tribe. The social worker then asked the paternal grandfather if there was any Native American ancestry on his side or the paternal grandmother's side, and he said no.

Father contends the failure of the court or CFS to ask the paternal uncle and the paternal great aunt about possible Indian ancestry at the placement hearing was "potentially significant" since it was "unclear whether the ICWA might also apply to both children based on the *paternal* grandmother's Indian ancestry." He notes that the paternal grandmother was deceased and could not be questioned, and contends that her son, the paternal uncle, and especially her sister, the paternal great aunt, "were likely to know" whether the paternal grandmother had Indian ancestry.

"At the commencement of a child custody proceeding, the court is obligated to inquire from each participant whether there is a 'reason to know' that the child is or may be an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1129-1130; 25 U.S.C. § 1912(a); 25 C.F.R. § 23.107(a) (2024); § 224.2, subd. (c).) "An implementing federal regulation … observes that 'participants could … include … relatives or trial witnesses, depending on who is involved in the case.'" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1130, fn. 3.) Here, the paternal uncle and paternal great aunt were trial witnesses at the placement hearing on June 9, 2023 and were not asked if he/she had reason to know the children were Indian children. (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1129-1130; § 224.2, subd. (c).) Notably, "[t]he operative concept [of section 224.2] is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) The paternal

13

uncle and paternal great aunt were readily available when they appeared in court to testify, and they should have been asked about the children's potential Indian ancestry. Thus, the inquiry was inadequate.

Although father's claim only involves his side of the family, we acknowledge that CFS thoroughly inquired about the children's potential Native American ancestry on their mothers' sides. When Jamie N. (C.B., Jr.'s mother) claimed Indian heritage in the Chumash tribe, CFS sent ICWA notice to the BIA, Santa Ynez Band of Mission (Chumash) Indians, and the Tejon Indian Tribe. The Santa Ynez Band responded that C.B., Jr. was not eligible for enrollment, and the Tejon Indian Tribe similarly responded that he was not a member of the tribe. The record also indicates that CFS subsequently sent informal ICWA notice via email to the Santa Ynez Band of Chumash Mission Indians, and the Santa Ynez Chumash tribe responded that "[t]his family is not from the Santa Ynez Band of Chumash Indians." When Tamara B. (Josie B.'s mother) stated her mother and grandmother were enrolled members of the Mekoryuk Tribe, CFS sent ICWA notice to the BIA and the Mekoryuk Tribe. The Mekoryuk Tribe responded that Josie B. was eligible for enrollment, and it intervened in the proceedings.

Ultimately, because the paternal uncle and paternal great aunt were not asked about the children's possible Indian ancestry, the court should not have found that ICWA did not apply to C.B., Jr. (See *In re K.T.* (2022) 76 Cal.App.5th 732, 744.) Although the court properly found that ICWA applied to Josie B., further inquiry of these paternal relatives is still required. The order terminating parental rights must therefore be conditionally reversed, and the matter remanded for the court or CFS to make the proper

14

inquiry.  (§ 224.2, subds. (b) and (c).)  If the inquiry reveals a reason to believe C.B., Jr. is an Indian child and Josie B. is an Indian child through a tribe other than the Mekoryuk Tribe, the court shall proceed in conformity with ICWA and California implementing provisions.  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1152.)

## DISPOSITION

The order terminating parental rights is conditionally reversed.  The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and of Welfare and Institutions Code sections 224.2 (and, if applicable, the notice provisions as well) — specifically, to inquire of the paternal uncle and paternal great aunt regarding the children's Native American ancestry.  If, after completing the inquiry, neither CFS nor the court has reason to believe or know the children are Indian children, the order terminating parental rights shall be reinstated.  If CFS or the court has reason to believe that the children are Indian children, the court shall proceed in conformity with ICWA and California implementing provisions.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
J.


We concur:

CODRINGTON_____
           Acting P. J.

RAPHAEL_____
             J.

15